The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman, the briefs and oral arguments on appeal and upon Plaintiff's Motion for Reinstatement of Compensation. The appealing party has shown good ground to reconsider the evidence. Upon reconsideration of the evidence of record, the Full Commission affirms in part and reverses in part the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
******************
The Full Commission finds as a fact and concludes as a matter of law the following, which was entered into by the parties at the hearing on 21 March 1996 as:
STIPULATIONS
1. Defendants paid compensation to plaintiff for temporary total disability from 14 September 1992 through 31 May 1994 and from 1 July 1994 through 25 July 1995. Defendants paid compensation for temporary partial disability from 1 June 1994 through 30 June 1994.
2. The parties stipulated into evidence an indexed packet of medical records and reports.
An Industrial Commission Form 21, and Form 26 have been approved by the Commission and are incorporated by reference.
******************
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff, who was sixty-six years old on the date of hearing before Deputy Commissioner Chapman, began working for defendant-employer in 1988 as a mechanic. The company grew container plants and plaintiff's job involved performing maintenance and repairs on bulldozers and other heavy equipment used at the facility and on the donkeys, a form of electric cart used by the nursery to pull buggies.
2. On 1 July 1992 plaintiff sustained a compensable injury by accident. A donkey with a malfunctioning accelerator flipped over onto him and pinned him to the ground. Another employee had to push it off of him. The next day he was treated in the emergency room for multiple contusions and for back and left leg pain. X-rays revealed some spondylolisthesis at L5-S1 and plaintiff continued to complain of left leg pain, so he was referred to Dr. Darden, an orthopedic surgeon, who then ordered additional diagnostic tests. There were findings consistent with a fracture of his sacrum, so Dr. Darden removed plaintiff from work.
3. Dr. Darden treated plaintiff conservatively for his low back problem and plaintiff's response was so slow that in January 1993 he was sent for a comprehensive evaluation at the Charlotte Spine Center. There were some inconsistencies on Dr. Hicks' examination on 26 January 1993, so additional tests were ordered. A pentothal pain study indicated that his pain was nonphysiogenic. However, plaintiff then began to develop new symptoms of numbness in his hands and shoulder pain. On 19 May 1993 Dr. Darden ordered nerve tests which proved to be consistent with a C7-T1 radiculopathy, so he ordered a myelogram and CT Scan. After reviewing the results, he diagnosed plaintiff's condition as a ruptured disk and recommended surgery. Accordingly, plaintiff underwent surgery on 13 August 1993 to decompress and fuse the C7-T1 interspace.
4. Following the operation, Dr. Darden prescribed therapy and plaintiff experienced improvement in his symptoms, although he retained some numbness in fingers on his left hand. By 11 February 1994 he had made progress in physical therapy but there was some concern regarding inconsistencies in testing. His fusion was solid by February 1994 and on 13 May 1994 Dr. Darden released him to return to work at light duty on a part-time basis on 30 May 1994.
5. During the spring of 1994, defendants placed plaintiff under surveillance. On 4 May 1994 a private investigator observed plaintiff working on a truck at his son's business. Plaintiff was changing shock absorbers on the truck while lying on a creeper.
6. On 1 June 1994 plaintiff returned to work with restrictions from Dr. Darden which specified that he was to work four hours per day for two weeks, then six hours and finally eight hours per day, he was not to lift more than ten to fifteen pounds and no repetitive bending or stooping was to be required. Plaintiff could not, therefore, return to his former position and he was assigned to work in the maintenance department.
7. Ed Rye, the maintenance supervisor, was advised of plaintiff's restrictions and was to assign jobs accordingly. He designated jobs such as replacing fan belts on motors, helping to install pipe used with the irrigation system, winding twine and sorting tags for different types of plants. Except for the irrigation system work, plaintiff was essentially left alone to do the work. Although he knew what his restrictions were, he would do tasks, such as lifting motors, which he knew exceeded the limitations.
8. During plaintiff's final month of working for defendant-employer, he was anticipating retirement and his performance was poor. In fact, he repeatedly asked for his employer to fire him since he did not want to be there. To his employer, however, it appeared as if plaintiff was trying to take advantage of the workers' compensation system, and supervisory personnel were often harsh in their dealings with him. At the time when plaintiff was supposed to increase his working hours to six hours per day, he refused to do so unless he could work through lunch, which his employer would not allow. He later refused to work eight hours per day. Plaintiff continued to perform activities which he knew he was not supposed to do, and often these were not duties he was assigned to perform. However, defendant-employer failed to properly monitor plaintiff's activities to make sure he did not exceed his restrictions.
9. Finally, on 30 June 1994 plaintiff was terminated for refusing to work the hours he was supposed to and for his bad attitude. His termination was justified and involved circumstances in which a non-disabled employee would also have been fired.
10. Plaintiff subsequently sold his house and moved to a beach area in South Carolina. In April 1995 defendants again arranged for surveillance to be conducted on him. He was found to have a number of golf carts at his residence, several of which he was performing repairs to, either for neighbors or to fix them up so that he could sell them. Plaintiff described working on his attic, and his plans to add onto his shed. After receiving the report from the private investigator, defendants terminated payment of compensation.
11. Defendants admitted liability of plaintiff's injury by accident by virtue of entering into an Industrial Commission Form 21, approved by the Commission on 22 June 1995, and pursuant to which plaintiff was paid temporary total disability compensation from 14 September 1992 through 31 May 1994. Additionally, pursuant to an Industrial Commission Form 26, approved by the Commission on 22 June 1995, plaintiff was paid temporary partial disability compensation from 1 June 1994 through 30 June 1994.
12. Plaintiff reached maximum medical improvement with respect to his injury by accident on 1 July 1992. Although Dr. Darden had rated him on 13 May 1994, he had not gone through the gradual return to work program recommended by the doctor. As the result of his 1 July 1992 injury by accident, plaintiff sustained a twenty percent permanent partial disability to his back.
13. Although plaintiff was sixty-four years old and only had a fifth grade education, he was capable of earning wages as of 5 July 1994. He had almost forty years of experience as a mechanic and could perform lighter mechanical work. In fact, he performed such work for his son's business, for his neighbors and for himself. However, plaintiff wanted to retire from his position with defendant-employer and, consequently, plaintiff essentially removed himself from the job market. Following his termination by defendant-employer, plaintiff made no real efforts to find employment and it would not have been futile for him to seek other employment. Since his employment with defendant-employer ended, and because he did not attempt to secure other employment, plaintiff's actual capacity to earn wages cannot be determined, although he was not totally disabled.
14. After plaintiff was terminated, he received treatment for carpal tunnel syndrome and ulnar neuropathy in his left hand and arm. He had previously undergone nerve tests which revealed those problems. Defendants would not provide the treatment and plaintiff has moved that they be ordered to pay for it. However, plaintiff failed to prove that these conditions were a proximate result of his injury by accident of 1 July 1994 and his claim for that injury was the only one heard before Deputy Commissioner Chapman.
15. At the hearing before Deputy Commissioner Chapman, plaintiff made an oral Motion for Reinstatement of Compensation. Plaintiff filed a written Motion for Reinstatement of Compensation on the day following the hearing on 22 March 1996. Because of confusion as to whether the Executive Secretary or Deputy Commissioner had jurisdiction to rule on this motion, plaintiff submitted the motion to both Executive Secretary Tracey H. Weaver and Deputy Commissioner Morgan S. Chapman. By Order filed 25 June 1996, Executive Secretary Weaver denied plaintiff's motion "at this time" because the matter was currently pending before Deputy Commissioner Chapman. Deputy Commissioner Chapman did not address plaintiff's Motion for Reinstatement of Compensation in her Opinion and Award filed 9 October 1996.
16. On 1 July 1994 defendants reinstated temporary total disability benefits commencing at plaintiff's normal compensation rate and continued paying these benefits for 55 and 4/7 weeks through 25 July 1995. These payments were revealed through defendants' Form 33R, dated 31 August 1995 and in their Answers to plaintiff's Second Set of Interrogatories. Despite payment of temporary total disability benefits for this period of time, defendants failed to file a Form 26 or any other agreement, which is in violation of Industrial Commission Rules.
17. On 26 July 1995, defendants unilaterally terminated payment of temporary total disability benefits without filing an Industrial Commission Form 24 Application to Stop Payment of Compensation. By unilaterally terminating benefits, defendants have circumvented the procedural requirements of the Act and Industrial Commission Rules.
******************
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff is not entitled to additional payment of temporary total disability compensation as the result of his 1 July 1992 injury by accident. G.S. § 97-29.
2. As the result of his 1 July 1992 injury by accident, plaintiff is entitled to be paid by defendants permanent partial disability compensation at the rate of $280.01 per week for a period of sixty weeks, commencing as of 5 July 1994, for the twenty percent (20%) disability he sustained to his back. G.S. § 97-31(23).
3. By reinstating payments of compensation to plaintiff from 1 July 1994 through 25 July 1995 and thereafter unilaterally terminating these payments without filing the appropriate forms, defendants have circumvented the procedural mechanisms and statutory intent of G.S. § 97-18. Nevertheless, payments of compensation by defendants which commenced on 1 July 1994 do constitute a reinstatement of compensation under the terms of G.S. § 97-18(b). Furthermore, the reinstatement of compensation pursuant to G.S. § 97-18(b) is an award of the Industrial Commission under the terms of G.S. § 97-82(b). Thus, these payments were due and payable and defendants are not entitled to a credit against the permanent partial disability compensation to which plaintiff is entitled. G.S. § 97-42.
4. As the result of his 2 July 1992 injury by accident, plaintiff is entitled to have defendants pay for all reasonable medical expenses incurred or to be incurred, but excluding expenses related to his carpal tunnel syndrome and ulnar neuropathy. G.S. § 97-25.
******************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms in part and reverses in part the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to the attorney's fee awarded herein, defendants shall pay permanent partial disability compensation to plaintiff at the rate of $280.01 per week for a period of sixty weeks, commencing as of 5 July 1994, for the twenty percent (20%) disability plaintiff sustained to his back. This compensation having accrued, shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his 2 July 1992 injury by accident, but excluding those arising from treatment for carpal tunnel syndrome and ulnar neuropathy.
3. A reasonable attorney's fee in the amount of 25% of the compensation awarded to plaintiff herein is approved for counsel for plaintiff, and shall be deducted from the lump sum owed to plaintiff and paid directly to Mr. Sumwalt.
4. Defendants shall pay the costs.
 S/ ___________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ___________________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ___________________________ DIANNE C. SELLERS COMMISSIONER